FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA    2016 SEP 28  PM 2:58

| | |
|---|---|
| LAWRENCE E. SCHWANKE, DC, d/b/a BACK TO BASICS FAMILY CHIROPRACTIC, a Florida resident, individually and as the representative of a class of similarly-situated persons, ) ) ) ) ) ) | C⸱.                    ℞T |
| Plaintiff, ) | Case No. *5:14-CV-593-Oc-41PRC* |
| v. ) ) | |
| EARLYSHARES.COM, INC. and JOHN DOES 1-12 ) ) ) | |
| Defendants. ) | |

CLASS ACTION COMPLAINT

Plaintiff, Lawrence E. Schwanke, DC, d/b/a Back to Basics Family Chiropractic. ("Back to Basics" and "Plaintiff"), brings this action on behalf of itself and all other persons similarly situated and, except for those allegations pertaining to Plaintiff or its attorneys, which are based upon personal knowledge, alleges the following upon information and belief against defendants EarlyShares.com, Inc., ("EarlyShares"), and John Does 1-12 (collectively "Defendants"):

PRELIMINARY STATEMENT

1.     Defendants have sent advertisements by facsimile in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227, and the regulations the Federal Communications Commission ("FCC") has prescribed thereunder, 47 C.F.R. § 64.1200 (collectively, the "TCPA").

2.     Defendants sent Plaintiff at least one advertisement by facsimile and

in violation of the TCPA. <u>Exhibit A</u>. Exhibit A lacks an opt-out notice on its first page.

3.     Plaintiff brings this action on behalf of itself and a class of all similarly-situated persons, and against Defendants, seeking statutory damages for each violation of the TCPA, trebling of the statutory damages, injunctive relief, compensation and attorney fees (under the conversion count), and all other relief the Court deems appropriate under the circumstances.

4.     Unsolicited faxes cause damage to their recipients. A junk fax recipient loses the use of its fax machine, paper, and ink toner. Unsolicited faxes tie up the telephone lines, prevent fax machines from receiving authorized faxes, prevent their use for authorized outgoing faxes, cause undue wear and tear on the recipients' fax machines, and require additional labor to attempt to discern the source and purpose of the unsolicited message. Moreover, a junk fax interrupts the recipient's privacy. An unsolicited fax wastes the recipient's valuable time that would have been spent on something else.

5.     The TCPA prohibits the use of "any telephone facsimile machine, computer or other device to send, to a facsimile machine, an unsolicited advertisement...." 47 U.S.C. § 227 (b)(1)(C). The TCPA defines an "unsolicited advertisement" as "**any** material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission...." *Id.*, § 227 (a)(5) (emphasis added).

2

6.    Defendants' fax advertises EarlyShares' crowdfunding services.

7.    Defendants' fax advertises the "Small Business Challenge" which promoted EarlyShares' crowdfunding and services.

## PARTIES, JURISDICTION, AND VENUE

8.    Plaintiff is a Florida resident doing business in Marion County, Florida.

9.    On information and belief, defendant EarlyShares.com Inc. is a Delaware corporation with its principal place of business in Miami, Florida.

10.    John Doe Defendants 1-12 are persons not yet known to Plaintiff that actively participated in the transmission of fax advertisements to the class, or benefitted from those transmissions.

11.    The Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 47 U.S.C. § 227.

12.    General personal jurisdiction exists over EarlyShares in Florida because it has its headquarters within the State.

13.    Venue is proper in the Middle District of Florida because Defendants committed statutory torts within this District and a significant portion of the events took place here.

## FACTS

14.    EarlyShares.com Inc. owns and operates a crowdfunding website which connects small business owners to eligible investors.

15.    After the Jumpstart Our Business Startups Act ("JOBS Act") was

3

enacted, EarlyShares sought to promote its crowdfunding services by sponsoring and promoting the Small Business Challenge, which offered a share of $50,000 in cash and marketing resources to small businesses that would be eligible to receive crowdfunding under the JOBS Act.

16.     Defendants' fax directed its recipients to go to www.smbchallenge.com. Exhibit A.

17.     www.smbchallenge.com   links   to   Contest   Rules,   Exhibit   C; EarlyShares' privacy policy, Exhibit C; Frequently Asked Questions, Exhibit D; a link to enter the contest, and a link to EarlyShares' main website.

18.     EarlyShares created and sponsored the contest. Exhibit B.

19.     EarlyShares' contest rules inform the reader that participation in Defendants' Small Business Challenge, meant that the participants agreed to allow EarlyShares to contact them for advertising and marketing purposes. Exhibit B.

20.     To win EarlyShares' Small Business Challenge, a participant needed to obtain at least 100 "votes". Exhibit B, How to Win.

21.     The only way to place a "vote" was to visit EarlyShares' Small Business Challenge website via Facebook. Exhibit D, How Do I Log In.

22.     EarlyShares' Privacy Policy informs the reader that EarlyShares may sell customer, email, and visitor information it obtains. Exhibit C ("EarlyShares may buy or sell assets or business offerings. Customer, email, and visitor information is generally one of the transferred business assets in these types of transactions.")

23.     Defendants' fax was a pretext to promote its crowdfunding services.

24.     Defendants' fax was a pretext to collect contact information and consent for future advertising from EarlyShares and its partners.

25.     Defendants' fax was a pretext to increase traffic to its crowdfunding webpage and to collect Facebook data from potential voters.

26.     Defendants sent advertisements by facsimile to Plaintiff and a class of similarly-situated persons. Whether Defendants did so directly or with the assistance of a third party (yet unknown to Plaintiff), Defendants are directly liable for violating the TCPA.

27.     Plaintiff has received at least one of Defendants' advertisements by facsimile. A true and correct copy of the September 28, 2012 fax is attached as Exhibit A. Plaintiff intends to discover the number of other Defendants' advertisements sent to Plaintiff by fax.

28.     Exhibit A is one-page document Defendants sent by fax, advertising the "Small Business Challenge" sponsored and created by EarlyShares.

29.     The fax advertises the commercial availability or quality of EarlyShares' crowdfunding website and services by inviting the recipient to visit EarlyShares' website and agree to receive EarlyShares' advertising and marketing promotions.

30.     Exhibit A includes EarlyShares' name and logo.

31.     Exhibit A states the context is sponsored by EarlyShares.

32.     Exhibit A does not include the mandatory opt-out notice required by

the TCPA. *See* 47 U.S.C. § 227 (b) (2) (D) & (E) and 47 C.F.R. § 64.1200 (a) (4) (iii) & (v).

33.  Exhibit A has no opt-out provision. Exhibit A.

34.  Plaintiff did not expressly invite or give permission to anyone to send Exhibit A or any other advertisement from EarlyShares to Plaintiff's fax machine. Even if Plaintiff had done so, however, the lack of an opt-out notice on Defendants' fax makes consent irrelevant.

35.  On information and belief, Defendants sent advertisements by facsimile to Plaintiff and more than 39 other persons in violation of the TCPA.

36.  Plaintiff and the other class members owe no obligation to protect their fax machines from Defendants. Their fax machines are ready to send and receive their urgent communications, or private communications about patients' medical needs, not to receive Defendants' unlawful advertisements.

## CLASS ACTION ALLEGATIONS

37.  Plaintiff brings this action as a class action on behalf of itself and all others similarly situated as members of a class, initially defined as follows:

> Each person that was sent one or more facsimiles promoting the "Small Business Challenge" sponsored by EarlyShares that did not state on its first page that the fax recipient may request that the sender not send any future fax and that the failure to comply with such a request within 30 days would be unlawful.

Plaintiff expressly reserves the right to modify the proposed class definition or propose subclasses.

38.  Excluded from the class are Defendants, any entity in which Defendants have a controlling interest, each of Defendants' officers, directors, legal

representatives, heirs, successors, and assigns, and any Judge assigned to this action, including his or her immediate family.

39. On information and belief, Defendants' fax advertising campaigns involved other, substantially-similar advertisements also sent without the opt-out notice required by the TCPA. Plaintiff intends to locate those advertisements in discovery. Exhibit E, a Demand for Preservation of All Tangible Documents Including Electronically Stored Information.

40. This action is brought and may properly be maintained as a class action pursuant to Fed. R. Civ. P. 23. This action satisfies Rule 23 (a)'s numerosity, commonality, typicality, and adequacy requirements. Additionally, prosecution of Plaintiff's claims separately from the putative class's claims would create a risk of inconsistent or varying adjudications under Rule 23 (b) (1) (A). Furthermore, the questions of law or fact that are common in this action predominate over any individual questions of law or fact making class representation the superior method to adjudicate this controversy under Rule 23 (b) (3).

41. **Numerosity/impracticality of joinder.** On information and belief, the class consists of more than 39 persons and, thus, is so numerous that individual joinder of each member is impracticable. The precise number of class members and their identities are unknown to Plaintiff, but will be obtained from Defendants' records or the records of third parties.

42. **Commonality and predominance.** There is a well-defined community of interest and common questions of law and fact that predominate over any questions

affecting only individual members of the class. These common legal and factual questions, which do not vary from one class member to another, and which may be determined without reference to the individual circumstances of any class member, include, but are not limited to the following:

   a.  Whether Defendants sent facsimiles promoting the commercial availability or quality of property, goods, or services;

   b.  Whether Exhibit A, and other yet-to-be-discovered facsimiles sent by or on behalf of Defendants, advertised the commercial availability or quality of property, goods or services;

   c.  The manner and method Defendants used to compile or obtain the list(s) of fax numbers to which they sent the faxes contained in Exhibit A and other fax advertisements;

   d.  Whether Defendants' fax advertisements contained opt-out notices as required by the TCPA;

   e.  Whether the Court should award Plaintiff and the other class members statutory damages;

   f.  Whether, if the Court finds that Defendant(s) willfully or knowingly violated the TCPA, the Court should exercise its discretion to increase the amount of the statutory damages award to an amount equal to not more than three times the amount;

   g.  Whether the Court should enjoin Defendants from faxing advertisements in the future; and

h.     Whether Defendants' conduct as alleged herein constituted conversion.

43.     **Typicality of claims.** Plaintiff's claims are typical of the claims of the other class members, because Plaintiff and all class members were injured by the same wrongful practices. Plaintiff and the members of the class received Defendants' advertisements by facsimile and those advertisements did not contain the opt-out notice required by the TCPA. Under the facts of this case, because the focus is upon Defendants' conduct, if Plaintiff prevails on its claims, then the other putative class members will prevail as well.

44.     **Adequacy of representation.** Plaintiff is an adequate representative of the class because its interests do not conflict with the interests of the class it seeks to represent. Plaintiff has retained counsel competent and experienced in complex class action litigation, and TCPA litigation in particular, and Plaintiff intends to vigorously prosecute this action. Plaintiff and its counsel will fairly and adequately protect the interest of members of the class.

45.     **Prosecution of separate claims would yield inconsistent results.** Even though the questions of fact and law in this action are predominantly common to Plaintiff and the putative class members, separate adjudication of each class member's claims would yield inconsistent and varying adjudications. Such inconsistent rulings would create incompatible standards for Defendants to operate under if/when class members bring additional lawsuits concerning the same unsolicited fax advertisements of if Defendants choose to advertise by fax again in

the future.

46.    **A class action is the superior method of adjudicating the common questions of law or fact that predominate over individual questions.** A class action is superior to other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all class members is economically unfeasible and procedurally impracticable. The likelihood of individual class members prosecuting separate claims is remote, and even if every class member could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases.

## COUNT I
## TELEPHONE CONSUMER PROTECTION ACT, 47 U.S.C. § 227

47.    Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

48.    Plaintiff brings Count I on behalf of itself and a class of similarly situated persons against Defendants.

49.    The TCPA prohibits the "use of any telephone facsimile machine, computer or other device to send an unsolicited advertisement to a telephone facsimile machine...." 47 U.S.C. § 227 (b) (1).

50.    The TCPA defines "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's express invitation or permission." 47 U.S.C. § 227 (a) (4).

51.    Exhibit A advertises the commercial availability or quality of

10

EarlyShares' crowdfunding website and services by inviting the recipient to visit EarlyShares' website and agree to receive EarlyShares' advertising and marketing promotions.

52.   Health-Scripts gathers the data from voters in EarlyShares' contest and then sells that data as a business asset.

53.   Defendants sent <u>Exhibit A</u> to Plaintiff and others offering a chance to win "up to $50,000 in cash and services."

54.   Entry into Defendants' consent grants consent to receive future advertising.

55.   The TCPA provides a private right of action as follows:

>   3.   <u>Private right of action</u>. A person may, if otherwise permitted by the laws or rules of court of a state, bring in an appropriate court of that state:
>
>>   (A)   An action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,
>>
>>   (B)   An action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or
>>
>>   (C)   Both such actions.

47 U.S.C. § 227 (b) (3).

56.   The Court, in its discretion, may treble the statutory damages if it determines that a violation was knowing or willful. 47 U.S.C. § 227 (b) (3).

57.   Here, Defendants violated 47 U.S.C. § 227 (b) (1) (C) by sending advertisements by facsimile (such as <u>Exhibit A</u>) to Plaintiff and the other class

members without their prior express invitation or permission.

58. The TCPA requires that every advertisement sent by facsimile must include an opt-out notice clearly and conspicuously displayed on the bottom of its first page. 47 U.S.C. § 227 (b) (2) (D) and (E); 47 C.F.R. § 64.1200 (a) (4).

59. Defendants failed to include a clear and conspicuous opt-out notice on Exhibit A.

60. The TCPA expressly mandates the form and content of an opt-out notice. 47 U.S.C. § 227 (b) (2) (D) & (E), in relevant part, states:

> In implementing the requirements of this subsection, the Commission ...
>
> (D) shall provide that a notice contained in an unsolicited advertisement complies with the requirements under this subparagraph only if...
>
> (i) the notice is clear and conspicuous and on the first page of the unsolicited advertisement;
>
> (ii) the notice states that the recipient may make a request to the sender of the unsolicited advertisement not to send any future unsolicited advertisements to a telephone facsimile machine or machines and that failure to comply, within the shortest reasonable time, as determined by the Commission, with such a request meeting the requirements under subparagraph (E) is unlawful;
>
> (iii) the notice sets forth the requirements for a request under subparagraph (E);
>
> (iv) the notice includes—
>
> > (I) a domestic contact telephone and facsimile machine number for the recipient to transmit such a request to the sender; and
> >
> > (II) a cost-free mechanism for a recipient to transmit a request pursuant to such notice to the sender of the unsolicited advertisement; the Commission shall by rule require

the sender to provide such a mechanism and may, in the discretion of the Commission and subject to such conditions as the Commission may prescribe, exempt certain classes of small business senders, but only if the Commission determines that the costs to such class are unduly burdensome given the revenues generated by such small businesses;

(v) the telephone and facsimile machine numbers and the cost-free mechanism set forth pursuant to clause (iv) permit an individual or business to make such a request at any time on any day of the week; and

(vi) the notice complies with the requirements of subsection (d) of this section;

(E) shall provide, by rule, that a request not to send future unsolicited advertisements to a telephone facsimile machine complies with the requirements under this subparagraph only if—

(i) the request identifies the telephone number or numbers of the telephone facsimile machine or machines to which the request relates;

(ii) the request is made to the telephone or facsimile number of the sender of such an unsolicited advertisement provided pursuant to subparagraph (D)(iv) or by any other method of communication as determined by the Commission; and

(iii) the person making the request has not, subsequent to such request, provided express invitation or permission to the sender, in writing or otherwise, to send such advertisements to such person at such telephone facsimile machine;

61.     The FCC's regulations at 47 C.F.R. § 64.1200 (a) (4) (iii) & (v) expressly

require the following:

(iii) The advertisement contains a notice that informs the recipient of the ability and means to avoid future unsolicited advertisements. A notice contained in an advertisement complies with the requirements under this paragraph only if -

(A) The notice is clear and conspicuous and on the first page of the advertisement;

(B) The notice states that the recipient may make a request to the sender of the advertisement not to send any future advertisements to a telephone facsimile machine or machines and that failure to comply, within 30 days, with such a request meeting the requirements under paragraph (a)(4)(v) of this section is unlawful;

(C) The notice sets forth the requirements for an opt-out request under paragraph (a)(4)(v) of this section;

(D) The notice includes -

(1) A domestic contact telephone number and facsimile machine number for the recipient to transmit such a request to the sender; and

(2) If neither the required telephone number nor facsimile machine number is a toll-free number, a separate cost-free mechanism including a Web site address or email address, for a recipient to transmit a request pursuant to such notice to the sender of the advertisement. A local telephone number also shall constitute a cost-free mechanism so long as recipients are local and will not incur any long distance or other separate charges for calls made to such number; and

(E) The telephone and facsimile numbers and cost-free mechanism identified in the notice must permit an individual or business to make an opt-out request 24 hours a day, 7 days a week.

...

(v) A request not to send future unsolicited advertisements to a telephone facsimile machine complies with the requirements under this subparagraph only if -

(A) The request identifies the telephone number or numbers of the telephone facsimile machine or machines to which the request relates;

(B) The request is made to the telephone number, facsimile number, Web site address or email address identified in the sender's facsimile advertisement; and

(C) The person making the request has not, subsequent to such request, provided express invitation or permission to the sender, in writing or otherwise, to send such advertisements to such person at such telephone

14

facsimile machine.

62.   Exhibit A does not provide any of the information the TCPA requires for a compliant opt-out notice. For example, Exhibit A fails to state on the advertisement's first page that the recipient may make a request to the sender not to send any future advertisement by facsimile and that the sender's failure to comply within 30 days is unlawful.

63.   Facsimile advertising imposes burdens on recipients that are distinct from the burdens imposed by other types of advertising. The required opt-out notice provides recipients the necessary information to opt-out of future fax transmissions, including a notice that the sender's failure to comply with the opt-out request will be unlawful. 47 C.F.R. § 64.1200 (a) (4).

64.   Defendants failed to include a compliant opt-out notice on the first page of Exhibit A. Defendants failed to include a toll-free telephone number and toll free fax number and did not indicate that Plaintiff or the class members can use that telephone number to have Defendants discontinue sending faxes in the future.

65.   Furthermore, Defendants' fax does not set forth the requirements for Plaintiff or any member of the putative class to properly request an opt-out as explained by 47 C.F.R. § 64.1200 (a) (4) (v). Specifically, the fax does not inform Plaintiff and other putative class members that they must identify the telephone number(s) of the telephone facsimile machine(s) to which the opt-out request relates. Additionally, the fax fails to inform Plaintiff and the putative class that a request must be made to the telephone number, facsimile number, Web site address or email address identified in the sender's facsimile advertisement. Finally, the

faxes fail to inform Plaintiff and the putative class that the person making the request has not, subsequent to such request, provided express invitation or permission to the sender, in writing or otherwise, to send such advertisements to such person at such telephone facsimile machine.

66.    Facsimile advertising imposes burdens on recipients that are distinct from the burdens imposed by other types of advertising. The required opt-out notice provides recipients the necessary information to opt-out of future fax transmissions, including a notice that the sender's failure to comply with the opt-out request will be unlawful. 47 C.F.R. § 64.1200 (a) (4).

67.    Defendants' failure to include a compliant opt-out notice on their fax advertisements makes irrelevant any express consent or established business relationship ("EBR") that otherwise might have justified Defendants' fax advertising. 47 C.F.R. § 64.1200 (a) (4).

68.    The TCPA is a strict liability statute and Defendants are liable to Plaintiff and the other class members even if their actions were negligent. 47 U.S.C. § 227 (b) (3).

69.    Even if Defendants did not intend to injure Plaintiff and the other class members, did not intend to violate their privacy, and did not intend to waste their valuable time with Defendants' advertisements, those facts are irrelevant because the TCPA is a strict liability statute.

70.    If Defendants' actions were knowing or purposeful, then the Court has the discretion to increase the statutory damages up to three times the amount. 47

16

U.S.C. § 227 (b) (3).

71.    EarlyShares is liable for the fax advertisement at issue because it sent the faxes, caused the faxes to be sent, participated in the activity giving rise to or constituting the violation, the faxes were sent on its behalf, or under general principles of vicarious liability, including actual authority, apparent authority and ratification; and the fax promoted the quality or commercial availability of EarlyShares' crowdfunding services.

72.    EarlyShares benefitted from the sending of the faxes in that it increased awareness of and directed traffic to EarlyShares' crowdfunding website program and sought visitors to which EarlyShares intended to market investment funds or opportunities.

73.    Defendants knew or should have known that Plaintiff and the other class members had not given express invitation or permission for Defendants or anybody else to fax advertisements about Defendants' goods, products, or services, that Plaintiff and the other class members did not have an established business relationship with Defendants, that Exhibit A is an advertisement, and that Exhibit A did not display a compliant opt-out notice as required by the TCPA.

74.    Defendants' actions damaged Plaintiff and the other class members. Receiving Defendants' junk faxes caused the recipients to lose paper and toner consumed in the printing of Defendants' faxes. Moreover, the subject faxes used the fax machines of Plaintiff and the other class members. The subject faxes cost Plaintiff time, as Plaintiff and its employees wasted their time receiving, reviewing

and routing Defendants' illegal faxes. That time otherwise would have been spent on Plaintiff's business activities. Defendants' faxes unlawfully interrupted Plaintiff and the other class members' privacy interests in being left alone. Finally, the injury and property damage sustained by Plaintiff and the other class members from the sending of unlawful fax advertisements occurred outside Defendants' premises.

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, demands judgment in its favor and against Defendants, jointly and severally, as follows:

A.     That the Court adjudge and decree that the present case may be properly maintained as a class action, appoint Plaintiff as the representative of the class, and appoint Plaintiff's counsel as counsel for the class;

B.     That the Court award $500.00 in statutory damages for each violation of the TCPA;

C.     That, if it finds Defendant(s) willfully or knowingly violated the TCPA's faxing prohibitions, the Court exercise its discretion to increase the amount of the statutory damages award to an amount equal to not more than three times the amount (Plaintiff requests trebling);

D.     That the Court enter an injunction prohibiting Defendants from violating the TCPA; and

E.     That the Court award costs and such further relief as the Court may deem just and proper.

## COUNT II
## COMMON LAW CONVERSION

75.     Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

76.     Plaintiff brings Count II on behalf of itself and a class of similarly situated persons and against Defendant.

77.     By sending advertisements to their fax machines, Defendants improperly and unlawfully converted the class's fax machines to Defendants' use. Where printed (as in Plaintiff's case), Defendants also improperly and unlawfully converted the class members' paper and toner to Defendants' own use. Defendants also converted Plaintiff's time to Defendants' own use, as they did with the valuable time of the other class members.

78.     Immediately prior to the sending of the unsolicited faxes, Plaintiff and the other class members each owned an unqualified and immediate right to possession of their fax machines, paper, toner, and employee time.

79.     By sending them unsolicited faxes, Defendants permanently misappropriated the class members' fax machines, toner, paper, and employee time to their own use. Such misappropriation was wrongful and without authorization.

80.     Defendants knew or should have known that the misappropriation of paper, toner, and employee time was wrongful and without authorization.

81.     Plaintiff and the other class members were deprived of the use of the fax machines, paper, toner, and employee time, which could no longer be used for any other purpose. Plaintiff and each class member thereby suffered damages as a

result of their receipt of unsolicited fax advertisements from Defendants.

82.    Defendants' unsolicited faxes effectively stole Plaintiff's employees' time because persons employed by Plaintiff were involved in receiving, routing, and reviewing Defendants' illegal faxes. Defendants knew or should have known employees' time is valuable to Plaintiff.

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, demands judgment in its favor and against Defendants, jointly and severally, as follows:

A.    That the Court adjudge and decree that the present case may be properly maintained as a class action, appoint Plaintiff as the representative of the class, and appoint Plaintiff's counsel as counsel for the class;

B.    That the Court award appropriate damages;

C.    That the Court award punitive damages;

D.    That the Court award attorney's fees;

E.    That the Court award costs of suit; and

F.    That the Court award such further relief as it may deem just and proper under the circumstances.

Respectfully submitted,

LAWRENCE E. SCHWANKE, DC, d/b/a
BACK TO BASICS FAMILY
CHIROPRACTIC, a Florida resident,
individually and as the representative of a
class of similarly-situated persons,

By: /s/ Phillip A. Bock

Phillip A. Bock
Fla. Bar No. 93895
Bock, Hatch, Lewis & Oppenheim, LLC
134 N. La Salle St., Ste. 1000
Chicago, IL 60602

P.O. Box 416474
Miami Beach, FL 33141
Telephone: 312-658-5500
Facsimile: 312-658-5555

# EXHIBIT A



# REGISTER
# YOUR BUSINESS
## IN THE SMALL BUSINESS CHALLEGE

### OR NOMINATE YOUR FAVORITE SMALL BUSINESS NOW



# www.smbchallenge.com

The Small Business Challenge℠ is a way for companies to compete for up to

# $50,000

IN CASH & SERVICES, WHILE CREATING NEW JOBS IN THE USA

### Contest Schedule
The contest entry period will run from September 1, 2012 through October 31, 2012 and the winners will be announced on November 9, 2012.



As seen on

     

# EXHIBIT B



# CONTEST RULES

*Updated date: 08/31/2012*

**The Small Business Challenge**
The Small Business Challenge* ("Contest") is a contest created and sponsored by
EarlyShares.com, Inc., together with its directors, employees, agents, suppliers, partners, and
content providers (individually and collectively, "we," "us," "our," or "EarlyShares"), a Delaware
corporation, with the mission of stimulating job creation in America by granting the top three
businesses ("Winners") cash & prizes for their small-to-medium businesses. These Contest Rules,
together with the Privacy Policy, and Terms and Conditions (collectively, the "Agreement") govern
the Contest and set forth the terms and conditions between you and EarlyShares when you access
or use the Website or in connection with the Contest, including participation or browsing. In the
event that you breach any of the terms of the Agreement, your right to use the Website or right to
participate in the Contest will terminate immediately. Participation in the Contest, by either
registering a business or voting for a business, constitutes each user's acknowledgment and
acceptance of the Agreement. There is no purchase necessary to enter or win.

**Contest Period**
The Contest entry period will begin at 12:00 a.m. Eastern Standard Time ("EST") on September 1,
2012 and end at 5:00 p.m. EST on October 31, 2012 ("Contest Entry Period"). The Finalist Voting
Period will begin at 5:01 p.m. EST on November 2, 2012 and end at 11:59 p.m. EST on November
8, 2012 ("Finalist Voting Period"). On November 9, 2012, EarlyShares will announce the Finalists
on the www.smbchallenge.com ("Website"). The Contest Website timestamp is the official time-
keeping device for the Contest and determines the final time of submissions.

**Eligibility**
The Contest is open only to legal residents of the fifty (50) states of the United States and the
District of Columbia who are at least twenty-one (21) years or older and owners of a currently
active, lawful, for-profit small-to-medium business (as defined below). An eligible small-to-medium
business must employ less than one hundred (100) employees for the duration of the Contest, be a
for-profit only business and legal resident of the fifty (50) states of the United States or the District
of Columbia, and have a valid employer identification number or taxpayer identification number
("Small Business"). Employees of EarlyShares, its parent or affiliate companies, licensees,
franchisees, advertising and promotional agencies, prize providers and the immediate family
members (spouse, parents, siblings, and children) and those living in the same household (whether
legally related or not) of each are not eligible.

A business will not be eligible if it, or any of its owners, management, or affiliated organizations are,
or have been, under any investigation for fraud, misconduct (financial or otherwise) or other
criminal activity; promote or suggest, directly or indirectly, the illegal use of firearms/weapons,
money remittance, check cashing services, use or sale of any illegal drugs (state or federal),
prostitution or pornography, violence, or the underage use of alcohol; suggest or encourage,
directly or indirectly, the taking up of arms against any person, government or entity or otherwise
challenge or seek to overthrow any government; disparage or denigrate (in writing or otherwise)
any race, age, gender, disability, sexual orientation, ethnicity, religion, political orientation, national
origin, citizenship, ancestry, marital status, veteran status or mental or physical disability or
condition or otherwise discriminates (in an exclusionary way) against any of those groups based
solely on being classified as fitting into those groups; disparage, denigrate (in writing or otherwise),
or act by means of adversarial or confrontational tactics to impact a product, service, person,
industry, or organization including, but not limited to, EarlyShares or any Contest participant;
participate in the Contest, or otherwise conduct itself, in an unsportsmanlike or inappropriate
manner; post prohibited content; or violate the Agreement.

EarlyShares, in its sole discretion, retains the right to determine eligibility of businesses to
potentially proceed as Semi-finalists or Finalists and reserves the right to disqualify a registrant at
any time for any reason. Submitting or posting Prohibited Content (described below) constitutes
automatic disqualification from the Contest. All content that has been posted on the Website
referencing or related to a Small Business that is later deemed ineligible, may be promptly removed

from the Website without prior notice. The Contest is subject to all applicable federal, state, and local laws and regulations and is void where prohibited by law.

**Entering the Contest**
During the Contest Entry Period, a user may register his or her Small Business for the Contest by following instructions on the Website or a user may nominate a Small Business ("Nominator") for the Contest. When a Nominator nominates a Small Business, the Small Business will receive an email notification alerting it of the nomination and offering a link to register for the Contest. A Facebook account is required to register a Small Business. Only one (1) registration per Facebook account is permitted. If you have more than one Small Business, you may register any or all of your Small Businesses, subject to registration rules set forth in the Agreement. Entries generated by a robotic script, macro, or other automated means or devices are null and void. All entries will become the property of EarlyShares.

**How to Compete**
Once a Small Business is registered for the Contest, it will receive a link to its own exclusive web page containing information about the company profile and a button to vote for the Small Business ("Landing Page"). The link to the Landing Page may be used on social media web pages to accrue fan votes. You may not entice fans to vote for your Small Business by offering any type of consideration, gift, award, or inducement, including merchandise, cash, online currency, discounts, vote trading or anything deemed to have value in exchange for votes. Such practices are prohibited and grounds for immediate disqualification from the Contest. EarlyShares does not encourage spamming. Small Businesses are solely responsible for abiding by Twitter anti-spamming rules and Facebook rules, and EarlyShares will not be responsible for any breaches of Twitter or Facebook rules. To access Twitter's rules, go to https://support.twitter.com/articles/18311-the-twitter-rules. To access Facebook's rules, go to https://www.facebook.com/communitystandards. A breach of Twitter or Facebook rules will result in disqualification from the Contest.

**Voting for a Small Business**
To vote for a Small Business, follow instructions on the Website, or visit the Landing Page of the Small Business to vote. Each fan is permitted one (1) vote during the Contest Entry Period. Voting ends at the close of the Contest Entry Period. EarlyShares reserves the right to eliminate or disregard any or all votes cast by users in excess of stated limits or otherwise not in accordance with the Agreement or any instructions on the Website, including any voting instructions. EarlyShares is not responsible for, nor required to count late, lost, misdirected, unlawful or illicit votes, votes cast for an applicant later determined to be ineligible, votes cast in exchange for consideration, a chance to receive a gift, or award, including merchandise, cash, online currency, or anything deemed to have value, votes achieved through automated means, by registering more than one user profile, using another person's Facebook account and name, as well as votes that are achieved through other fraudulent means, unsportsmanlike conduct or in a manner otherwise inconsistent with the Agreement.

**How to Win**
At the end of the Contest Entry Period, an EarlyShares panel ("Expert Panel") will select ten (10) Small Businesses ("Finalists") from a pool of fifty (50) Small Businesses ("Semi-finalists"). The pool will consist of twenty-five (25) Small Businesses from Group A and twenty-five (25) Small Businesses from Group B. Group A will contain the twenty-five (25) Small Businesses that have accrued the highest number of total fan votes during the Contest Entry Period. In the event of a tie that would cause more than twenty-five (25) companies to qualify for inclusion of Group A, the Expert Panel will break the tie based on selecting the Small Business that has the greatest or most innovative job-creating potential. Group B will contain twenty-five (25) Small Businesses that have secured at least one hundred (100) fan votes and that have the greatest or most innovative job-creating potential, as determined by the Expert Panel. Once selected by the Expert Panel to be a Finalist, then any fans, including those that have already voted during the Contest Entry Period, may cast one (1) vote for a Finalist of their choosing during the Finalist Voting Period. Once the Finalist Voting Period has concluded, the three (3) Finalists that have accrued the highest number of total fan votes during the Finalist Voting Period will be deemed the Winners. First Place Winner will be the Finalist that accrues the highest total number of fan votes during the Finalist Voting Period. Second Place Winner will be the Finalist that accrues the second highest total number of total fan votes during the Finalist Voting Period. Third Place Winner will be the Finalist that accrues the third highest total number of votes during the Finalist Voting Period. In the event of a tie between the potential Winners, the Finalist that accrued more votes during the Contest Entry Period shall break such a tie. EarlyShares reserves the right to select fewer than fifty (50) Semi-finalists if, in its sole discretion, it does not receive a sufficient number of eligible and qualified

entries. Decisions made with respect to the Contest, Semi-Finalists, Finalists, and Winners by the Expert Panel shall be final and binding.

**Prizes**

The First Place, Second Place, and Third Place Winners (collectively, the "Winners") will be awarded prizes as follows:

The First Place Winner will receive a prize of twelve thousand five hundred dollars ($12,500) cash, XM-Radio Advertising & Marketing from Hogan Media & Music (www.hoganmarketingandmedia.com) valued at seven thousand five hundred dollars ($7,500), advertising services from lonelybrand (www.lonelybrand.com) valued at two thousand five hundred dollars ($2,500), and advertising services from CometAds (www.cometads.com) valued at two thousand five hundred dollars ($2,500); the total approximate retail value ("ARV") of the prize is twenty-five thousand dollars ($25,000).

The Second Place Winner will receive a prize of five thousand dollars ($5,000) cash, XM-Radio Advertising & Marketing from Hogan Media & Music (www.hoganmarketingandmedia.com) valued at five thousand dollars ($5,000), advertising services from lonelybrand (www.lonelybrand.com) valued at two thousand five hundred dollars ($2,500), and advertising services from CometAds (www.cometads.com) valued at two thousand five hundred dollars ($2,500); ARV of the prize is fifteen thousand dollars ($15,000).

The Third Place Winner will receive a prize of two thousand five hundred dollars ($2,500) cash, XM-Radio Advertising & Marketing from Hogan Media & Music (www.hoganmarketingandmedia.com) valued at two thousand five hundred dollars ($2,500), advertising services from lonelybrand (www.lonelybrand.com) valued at two thousand five hundred dollars ($2,500), and advertising services from CometAds (www.cometads.com) valued at two thousand five hundred dollars ($2,500); ARV of the prize is ten thousand dollars ($10,000).

All cash prizes will be distributed in the form of a check made out to the Winners for the respective amount mentioned in this section within eight (8) to ten (10) weeks after Winners are confirmed. Non-cash prizes are not redeemable for cash except as required by law. All prizes are non-transferable, except to a surviving spouse residing in the same household. No substitutions are allowed, except at the sole discretion of EarlyShares. EarlyShares reserves the right to substitute a prize of equal or greater value in the event the prize is unavailable. Each Winner is responsible for payment of Federal, State, and Local taxes and fees due, if any, are the sole responsibility of the Winner. EarlyShares will issue a 1099-MISC tax for to each Winner.

**Notification to Semi-finalists, Finalists, and Winners**

Semi-finalists, Finalists, and Winners (collectively, the "Parties") may be notified by EarlyShares via the email address provided during the Contest Entry Period. Each Finalist will receive notification of his or her status as a Finalist and may be required to sign and return to EarlyShares an Affidavit of Eligibility, a Background Check Authorization Form, a Nondisclosure Agreement or an affirmation of the employer identification number or taxpayer identification number within two (2) business days as a condition of potentially becoming a Winner. EarlyShares reserves the rights to require disclosure of necessary information from any and all Semi-Finalists, Finalists, and Winners, including, but not limited to, criminal court records and police reports, to confirm eligibility in the Contest. By registering for a chance to win a prize in this Contest, you consent to disclose the necessary information for EarlyShares to determine your eligibility in the Contest, should it choose to do so. EarlyShares reserves the right to disqualify any party that fails to disclose necessary information to confirm eligibility. All Parties who fail to reply to EarlyShares' requests within two (2) business days are subject to disqualification from the Contest. In the event that a Party becomes disqualified due to failure to reply to notification, the Expert Panel, at its sole discretion, will select another Small Business to fill the slot.

**Claiming Prizes**

To claim a prize, each Winner will be required to affirm that it will use the prize exclusively for the furtherance of the Small Business that was registered and became a Winner. EarlyShares may require additional documentation from the potential or actual Winners to confirm eligibility to receive one of the three prizes. EarlyShares also reserves the right to conduct additional research or investigation regarding any information submitted by a Winner. Winners will receive cash prizes only after EarlyShares has determined that eligibility requirements have been met. All Parties who fail to reply to EarlyShares' requests within two (2) business days are subject to disqualification from the Contest. In the event that a Party becomes disqualified due to failure to reply to

notification, the Expert Panel, at its sole discretion, will select another Small Business to fill the slot. In such an event, EarlyShares shall have no further obligation to that potential Winner, and an alternate Winner may be announced. A Winner will be required to permit EarlyShares to use the Winner's name and likeness in any and all media, press materials, websites, photos, videos and any collateral materials developed for the Contest for two (2) years after disbursement of the prize (except where prohibited by law) and participate in media training, opportunistic media interviews, photo and video opportunities and social media platforms to promote the Contest.

**Disqualification**
EarlyShares reserves the right to disqualify, in its sole discretion, any Contest participant, Semi-Finalist, Finalist, or Winner who tampers with the entry process, intentionally submits more than a single entry, violates this Agreement, or acts in an unsportsmanlike or disruptive manner. Further, any participant of the Contest may be disqualified as a result of any of the following: (a) failure to respond to notifications as set forth in the Agreement; (b) returned or undeliverable email or mail; (c) failure to provide EarlyShares with satisfactory proof of age, identity, residency, or other eligibility requirements; or, (d) any other non-compliance with the Agreement. Incomplete entries or entries containing Prohibited Content may be disqualified.

**Prohibited Content**
All content must be appropriate for all ages. You represent and warrant that you will not submit any content that contains (a) content not in English: (b) confidential information that violates any obligation of confidentiality; (c) any viruses, spyware, malware, or other malicious components that are designed to harm the functionality of a computer in any way; (d) content referencing, facilitating, containing or using, Prohibited Content; or (e) content that infringes on the intellectual property rights of a third party. Prohibited Content may be removed from the Contest Website immediately and without notice. "Prohibited Content" includes, but is not limited to, content that EarlyShares, in its sole and absolute discretion, determines violates the Agreement or any applicable law, as well as content that promotes, suggests or encourages (a) gambling, including without limitation, any content related to online casinos, sports books, bingo or poker; (b) the use of firearms/weapons/ammunition, any illegal drugs, prostitution, pornography, nudity, profanity or other adult content, violence, or the use of alcohol or tobacco products; (c) the taking up of arms against any person, government or entity or otherwise challenge or seek to overthrow any government; (d) or otherwise contains or reflects (1) obscene, indecent, defamatory, libelous, slanderous and/or unlawful content, (2) content that infringes upon, or otherwise violates, the rights of any third party, including copyright, trademark, privacy, publicity or other personal or proprietary rights, (3) information that is false, misleading, deceptive or fraudulent, (4) hate speech, or other discriminatory, disparaging or denigrating content, whether directed at an individual or a group, and whether based upon race, age, gender, disability, sexual orientation, ethnicity, religion, political orientation, national origin, citizenship, ancestry, marital status, veteran status or mental or physical disability or condition, (5) content that disparages, denigrates, or uses adversarial or confrontational tactics to impact a product, service, person, industry, or organization including, but not limited to, EarlyShares or Contest participants, (6) content that is primarily intended to advance a religious denomination, expand membership or encourage conversion, (7) content advancing a particular political party or candidate or supporting lobbying for any particular party or candidate, or expanding or encouraging a membership or a particular political party, candidate or lobbying effort, (8) content inconsistent with the Agreement, or (9) unsportsmanlike conduct.

**Indemnification**
You release EarlyShares, and each of their respective parents, affiliates, subsidiaries, officers, directors, agents, employees, service providers, and all others associated with the development and execution of the Contest, from any and all liability with respect to, or in any way arising from, the Contest, including, but not limited to, any suspension, modification or cancellation of the Contest, content received or posted, or acceptance or use of the cash award, including liability for personal injury, death, damages or loss. As a condition of your participation in the Contest, you agree to indemnify and hold EarlyShares and its Third Party Content providers (as defined in the Terms and Conditions), officers, directors, employees, contractors, agents, suppliers, representatives, and affiliates harmless from and against any and all claims, losses, liabilities, damages, costs and expenses (including but not limited to attorneys' fees) arising out of or in any way connected with your misuse of the Website, Contest, Website content, including Third Party Content, or otherwise from your User Submissions (as defined in the Terms and Conditions), your violation of the Agreement, or infringement by you, or any third party using your account, of any intellectual property or other right of any person or entity. EarlyShares reserves the right to assume the exclusive defense and control of any matter otherwise subject to indemnification by you, in which event you will assist and cooperate with EarlyShares in asserting any available defenses.

**Miscellaneous**
No agency, partnership, joint venture, employment relationship, or agency relationship is created
between you and EarlyShares as a result of the Agreement and neither party has any authority of
any kind to bind the other in any respect. You agree that you shall not look to EarlyShares for any
compensation or other benefits, except those prizes awarded to Winners, as set forth in the
Agreement. You acknowledge and agree that the relationship between you and EarlyShares and
any of either party's designees is not a confidential, fiduciary, or other special relationship, and that
your decision to provide your content to the EarlyShares for participation in the Contest does not
obligate nor bind EarlyShares to a confidentiality agreement between it and you.

By participating in the Contest, you agree to the Agreement and that your registration submission
and the personal information collected from you in connection with your registration in this Contest,
including registration information, will be shared with EarlyShares or its designated agent(s) and
that you may be contacted by EarlyShares, the sponsor or its designated agent in connection with
the Contest. Content may be used for any purpose including to validate eligibility, advertising and
for marketing purposes.

Registering for the Contest constitutes your full and unconditional consent to the Agreement as well
as EarlyShares' decisions, which are final and binding in all matters related to the Contest.
Disbursement of the cash prize to each Prize Winner is contingent upon each Prize Winner fulfilling
all requirements set forth by the Agreement.

**General Conditions**
In the event there is a dispute as to the identity of the individual owner of a Small Business
nominated by a Nominator, the authorized account holder of the email address provided by the
Nominator will be deemed the potential registrant and will be subject to the Agreement should he or
she register a Small Business. If the Small Business makes it as a Semi-Finalist or Finalist,
EarlyShares may require proof that the individual is the owner of the Small Business.

**Winner's List**
Winners will be posted on the Website on November 9, 2012.

**Sponsor Information**
EarlyShares.com, Inc. is a Delaware corporation, operating at 1200 Brickell Avenue, Suite 1410,
Miami FL 33131.

**Questions**
If you have any questions regarding The Small Business Challenge™ you can send an email to
support@smbchallenge.com.

Back to top

Got back to SMBChallenge

# EXHIBIT C

 1.original

# PRIVACY

*Updated: 08/28/2012*

EarlyShares.com, Inc., together with its directors, employees, agents, suppliers, partners, and content providers (individually and collectively, "we," "us," "our," or "EarlyShares"), a Delaware corporation, is committed to protecting your personal and financial information. This Privacy Policy answers some questions about your nonpublic personally identifiable information and non-personally identifiable information we collect in connection with your use of www.smbchallenge.com ("Website") and participation in the Small Business Challenge℠ ("Contest"), how the information will be used, what we do with it, how we protect it, and your correction or deletion of that information. This Privacy Policy, together with the Terms and Conditions, and Contest Rules (collectively, the "Agreement") govern the Contest and set forth the terms and conditions between you and EarlyShares when you access or use the Website or in connection with the Contest, including participation or browsing. In the event that you breach any of the terms of the Agreement, your right to use the Website or right to participate in the Contest will terminate immediately.

In the course of providing services related to the Contest, we need to collect and maintain certain nonpublic personally identifiable information about you. We may use this personal information about you to service and maintain your account, process transactions in your account, respond to inquiries from you or your representative, develop, offer, and deliver products and services, further the purposes of the Contest or EarlyShares, or to fulfill legal and regulatory requirements. When you visit our Website, we may collect technical and navigational information, such as computer browser type, Internet protocol address ("IP address"), pages visited, and average time spent on our Website. This information may be used, for example, to alert you to software compatibility issues, or it may be analyzed to improve our Web design and functionality. We train our employees about privacy and limit access to this information. To maintain security of your online session and prevent unauthorized users from accessing your account we use firewall barriers, encryption techniques and authentication procedures. If you decide to withdraw from the Contest, EarlyShares will continue to adhere to the privacy policies and practices as described in this notice. We collect information about our users in three ways: directly from the user, from our web server logs, and through cookies.

## Information Collected Through Users

Any personal information or content that you voluntarily disclose for posting on the Website ("User Content") becomes available to the public. If you remove User Content, copies may remain viewable in cached and archived pages or if other users have copied or stored your User Content. We reserve the right, but have no obligation, to monitor the User Content you post on the Website. We have the right to remove any Prohibited Content (defined below) or information or material posted on the Website for any reason or no reason, including without limitation, if in our sole opinion, such information or material violates, or may violate, any applicable law, the Agreement, or to protect or defend our rights or property or those of any third-party. We also reserve the right to remove information upon the request of any third-party. The following information may be collected in connection with your use of the Website and your participation in the Contest:(a) information you provide online and on applications or other forms, or through discussions we have with you or your representatives, such as your name, address, e-mail address, telephone number, date of birth, income, employment information, and any information about your personal goals or objectives; (b) information entered online that may be stored even if you do not complete or submit an application; (c) information about your transactions with or through us, such as your account history or business information, if applicable; (4) information from third parties in order to verify your identity or to prevent fraud; (5) information from third parties that you authorize to provide information to us; or, (6) information you provide us about your external financial accounts or business ideas and practices in order for us to provide you special Contest features. Information regarding external financial accounts will not be disclosed to any other entities.

All content must be appropriate for all ages. You represent and warrant that you will not submit any content that contains (a) content not in English; (b) confidential information that violates any obligation of confidentiality; (c) any viruses, spyware, malware, or other malicious components that are designed to harm the functionality of a computer in any way; (d) content referencing, facilitating,

containing or using. Prohibited Content; or (e) content that infringes on the intellectual property rights of a third party. Prohibited Content may be removed from the Contest Website immediately and without notice. "Prohibited Content" includes, but is not limited to, content that EarlyShares, in its sole and absolute discretion, determines violates the Agreement or any applicable law, as well as content that promotes, suggests or encourages (a) gambling, including without limitation, any content related to online casinos, sports books, bingo or poker; (b) the use of firearms/weapons/ammunition, any illegal drugs, prostitution, pornography, nudity, profanity or other adult content, violence, or the use of alcohol or tobacco products; (c) the taking up of arms against any person, government or entity or otherwise challenge or seek to overthrow any government; (d) or otherwise contains or reflects (1) obscene, indecent, defamatory, libelous, slanderous and/or unlawful content, (2) content that infringes upon, or otherwise violates, the rights of any third party, including copyright, trademark, privacy, publicity or other personal or proprietary rights, (3) information that is false, misleading, deceptive or fraudulent, (4) hate speech, or other discriminatory, disparaging or denigrating content, whether directed at an individual or a group, and whether based upon race, age, gender, disability, sexual orientation, ethnicity, religion, political orientation, national origin, citizenship, ancestry, marital status, veteran status or mental or physical disability or condition, (5) content that disparages, denigrates, or uses adversarial or confrontational tactics to impact a product, service, person, industry, or organization including, but not limited to, EarlyShares or Contest participants, (6) content that is primarily intended to advance a religious denomination, expand membership or encourage conversion, (7) content advancing a particular political party or candidate or supporting lobbying for any particular party or candidate, or expanding or encouraging a membership or a particular political party, candidate or lobbying effort, (8) content inconsistent with the Agreement, or (9) unsportsmanlike conduct.

**E-mail**

If you correspond with us by e-mail, we may retain the content of your e-mail messages, your e-mail address and our responses in our e-mail records. We will retain e-mails that are sent from EarlyShares to you. Emails are subject to archival, monitoring or review by and/or disclosure to, someone other than the recipient. We retain e-mail correspondence to build records of our relationship and to measure and improve our service. We may, over time, delete these records if permitted by law. You may receive periodic update emails from EarlyShares. You may opt-out of the emails at any time. Instructions for unsubscribing are included in each email.

**Cookies**

Cookies are small text files sent by a website server to your web browser and stored on your computer. They recognize you as a repeat visitor, allowing you to log in faster and enhance your navigation through the site. Cookies do not identify you by name as an individual or by account number. Cookies also track traffic patterns on our website, helping us understand how you are using our Website. This information allows us to improve the security, content, navigation and functionality of our Website. Cookies note that your browser was used to visit certain sites, pages, or advertisements on a certain date, but are not used to collect or disseminate any personal information. Additionally, we use cookies on our Websites and the sites on which we advertise to track advertising performance and to collect aggregate data on web page viewing. We may contract with third-party service providers to assist us in better understanding our site visitors. These service providers are not permitted to use the information collected on our behalf except to help us conduct and improve our business.

**Internet Protocol (IP) Address**

As you enter our Website, we capture and retain the IP address of the device you are using, such as a personal computer or a handheld device. The IP address does not identify you or your personal information and is used for security purposes only. We may use this information to monitor and prevent fraud, diagnose problems, and (anonymously) estimate demographic information.

**Nonpublic Personally Identifiable Information**

We may store nonpublic personally identifiable information in locations outside of our direct control such as on servers, or databases co-located with hosting providers. You may, of course, decline to submit nonpublic personally identifiable information through the Website, in which case we may not be able to provide certain services to you. You may update or correct your account information and email preferences at any time in your online profile.

EarlyShares may buy or sell assets or business offerings. Customer, email, and visitor information is generally one of the transferred business assets in these types of transactions. We may also transfer such information in the course of corporate divestitures, mergers, or dissolution. In any such transfer of information, your user information would remain subject to this Privacy Policy.

**Protecting Your Information**

EarlyShares uses commercially reasonable physical, managerial, and technical safeguards to preserve the integrity and security of your personal information. We employ a variety of security measures, including encryption and authentication tools. Your personal information is stored behind firewalls and is only accessible by a limited number of people who are required to keep the information confidential. If you have a unique password or personal identification number ("PIN") for access to non-public areas of the Website, you are solely responsible for all activities that occur in connection with your PIN. To protect your privacy and security, maintain the secrecy of your unique password or PIN and account information, and for controlling access to your email communications from EarlyShares, you should take steps to protect the confidentiality of your PIN. Notify EarlyShares immediately if you become aware of any disclosure, loss, theft or unauthorized use of your PIN. Despite these measures, we cannot guarantee that unauthorized persons will always be unable to defeat our security measures.

EarlyShares makes no guaranty of confidentiality or privacy of any communication or information transmitted on the Website, in connection with your participation in the Contest, or any website linked to the Website. EarlyShares will not be liable for the privacy of email addresses, registration and identification information, disk space, communications, confidential or trade-secret information, or any other content stored on EarlyShares' equipment, transmitted over networks accessed by the Website, or otherwise connected with your participation in the Contest or use of the Website.

**Compromise of Personal Information**

In the event that personal information is compromised as a result of a breach of security, EarlyShares will promptly notify those persons whose personal information has been compromised, in accordance with the notification procedures set forth in this Privacy Policy, or as otherwise required by applicable law.

**Children's Privacy**

The Website and Contest are intended to be used by adults. Neither the Website, nor the Contest, is intended for children. EarlyShares does not knowingly collect or solicit personal information from anyone under the age of 13 or knowingly allow such persons to register. If you are under 13, please do not send any information about yourself to us, including your name, address, telephone number, or email address. No one under age 13 is allowed to provide any personal information to EarlyShares. In the event that we learn that we have collected personal information from person under age 13 without verification of parental consent, we will delete that information as quickly as possible. If you believe that we might have any information from or about a child under 13, please contact us at privacy@smbchallenge.com.

**Third-Party Websites**

When you select a link to a third-party site, you are subject to the privacy and security policies of the third-party and this Privacy Policy is no longer in effect. EarlyShares does not control the privacy policies or the privacy practices of any third-parties. We are not responsible for the practices employed by websites linked to or from our Website nor the information or content contained therein. Your browsing and interaction on any other website, including those that have a link on our Website, is subject to that website's own rules and policies. Please read over those rules and policies before proceeding.

**Notification Procedures**

It is our policy to provide notifications, whether such notifications are required by law or are for marketing or other business related purposes, to you via email notice, written or hard copy notice, or through conspicuous posting of such notice on our Website, as determined by EarlyShares in its sole discretion. We reserve the right to determine the form and means of providing notifications to you, provided that you may opt out of certain means of notification as described in the Privacy Policy.

**Changes to this Privacy Policy**

EarlyShares reserves the right to make changes to the contents of this Privacy Policy at our discretion. Any changes or updates become effective immediately upon posting to this site. Changes to the Privacy Policy will be reflected at the top of this web page with a posting of a "last updated" date. Please be sure to check this page periodically for changes. You are bound by changes to the Privacy Policy when you use the Website after those changes have been posted.

By using our site, you consent to the Privacy Policy, Terms and Conditions, and Contest Rules.

If you have questions about the Privacy Policy or would like to suggest improvements, please contact us at privacy@smbchallenge.com.

Back to top

Got back to SMBChallenge

# EXHIBIT D

🗷 1 original

# FAQ

Why vote?
What is The Small Business Challenge℠?
What is the contest schedule?
What are the rules?
What are the prizes?
How will the winners be selected?
When will the winners be announced?
How will I know if my company won?
Do these type of grants need to be repaid?
Do winners need to pay taxes on the prizes received?
Who can participate in the contest?
I am a start up business rather than an established company. Can I enter the competition?
What is more than one person registers the same company?
Will individuals be able to vote for multiple businesses?
How do I log in?
How to vote?
Where can I find the contest logo?
How do I encourage my customers to vote for my small business?
Where do my customers go to vote for my business?
Who is EarlyShares.com?

**Why Vote?**
When you vote for a company, you help that company get to 100 votes, which it needs to be considered by the judges. You have the ability to help connect your favorite small business to experts and capital. Why not vote?

**What is The Small Business Challenge℠?**
The Small Business Challenge℠ is a competition sponsored by several companies including EarlyShares.com, Inc., the contest is aimed at supporting JOB CREATION through American small businesses.

**What is the contest schedule?**
The contest runs from September 1st to November 9th, 2012.
The timeline is as follows:

Voting & Entry Period: September 1 - October 31
Panel Judging: October 31 - November 2
Crowd Judging: November 2 - November 7
Winners announced: November 9

**What are the rules?**
Please find the Contest Rules here.

**What are the prizes?**
The Challenge includes $50,000 in prizes. The First Place, Second Place, and Third Place Winners will be awarded prizes as follows:

The First Place Winner will receive a prize of twelve thousand five hundred dollars ($12,500) cash. XM-Radio Advertising & Marketing from Hogan Media & Music (www.hoganmarketingandmedia.com) valued at seven thousand five hundred dollars ($7,500), advertising services from lonelybrand (www.lonelybrand.com) valued at two thousand five hundred dollars ($2,500), and advertising services from CometAds (www.cometads.com) valued at two thousand five hundred dollars ($2,500); the total approximate retail value ("ARV") of the prize is twenty-five thousand dollars ($25,000).

The Second Place Winner will receive a prize of five thousand dollars ($5,000) cash. XM-Radio Advertising & Marketing from Hogan Media & Music (www.hoganmarketingandmedia.com) valued

at five thousand dollars ($5.000). advertising services from lonelybrand (www.lonelybrand.com) valued at two thousand five hundred dollars ($2,500), and advertising services from CometAds (www.cometads.com) valued at two thousand five hundred dollars ($2.500); ARV of the prize is fifteen thousand dollars ($15,000).

The Third Place Winner will receive a prize of two thousand five hundred dollars ($2,500) cash. XM-Radio Advertising & Marketing from Hogan Media & Music (www.hoganmarketingandmedia.com) valued at two thousand five hundred dollars ($2,500), advertising services from lonelybrand (www.lonelybrand.com) valued at two thousand five hundred dollars ($2,500), and advertising services from CometAds (www.cometads.com) valued at two thousand five hundred dollars ($2,500); ARV of the prize is ten thousand dollars ($10,000).

**How will the winners be selected?**
After the voting period concludes on October 31, the contestant pool will be reduced to 50, semifinalists:
- The 25 companies with the most votes are automatic semifinalists.
- A judging panel will select the other 25 semifinalists from the pool of companies that have accumulated more than 100 votes.
The panel will choose companies based on business potential and job creation criteria.
The panel will gather additional information about the semifinalist companies and the teams that run them. It will then select 10 companies to be judged by the crowd. The crowd will determine the Top 3 winners.

**When will the winners be announced?**
Winners will be announced on November 9th, 2012.

**How will I know if my company won?**
A public announcement will be made. Additionally, we will be contacting winners directly.

**Do these type of grants need to be repaid?**
Nope! It's yours to keep.

**Do recipients need to pay taxes on prizes received?**
Each Winner is responsible for payment of Federal, State, and Local taxes and fees due, if any, are the sole responsibility of the Winner. EarlyShares will issue a 1099-MISC tax for to each Winner.

**Who can participate in the contest?**
Everyone over 18 can vote for the company they support.
However, there are some participation eligibility criteria for businesses, please check the Contest Rules.

**I am a start up business rather than an established company. Can I enter the competition?**
You can enter. You just need to get at least 100 votes for your idea.

**What is more than one person registers the same company?**
It's not possible to register two companies under the same name. If you try to enter a company and the name is already taken, then the website will show you an error message.

**Will individuals be able to vote for multiple businesses?**
Each person only gets one vote - so choose carefully which company you think has the most potential and will use the money best!

**How do I log in?**
You will need a Facebook account to register your vote. When you click the button "Vote for Us", you will be logged into the The Small Business Challenge° site via Facebook Connect. A permissions screen from Facebook will appear. The site will utilize your Facebook credentials to register your vote and promote the company you supported.

**How to vote?**
If you were invited by a company. Click on the custom link they provided you and vote on their company page. If not, you can search for a company you want to vote for on the homepage and if you can't find them, you can nominate them!

**Where can I find the contest logo?**
A media kit can be found here. It includes all of the material you will need to promote your company.

**How do I encourage my customers to vote for my small business?**
You can connect with them on facebook and twitter, or you can send a email to your customers and fans. Ask friends and family. Contact groups of people who face the problem that your business solves.
We provide a media kit to help you gather votes with different ideas on how to increase your number of fans.

**Where do my customers go to vote for my business?**
When you register your business on smbchallenge.com, you will get your own special URL. You can send that URL to your fans; when they click it, they'll have the option to vote for your company.

**Who is EarlyShares.com?**
EarlyShares is an equity-based crowdfunding platform. Rather than a few angel investors each putting a lot of money into a company for a large share of it, EarlyShares will allow many people to each invest a small amount in exchange for a small share of small businesses and startups that they support.


Back to top

Got back to SMBChallenge

# EXHIBIT E

# BOCK, HATCH, LEWIS & OPPENHEIM, LLC

134 North La Salle Street, Suite 1000

Chicago, IL 60602

312-658-5500 (Phone) • 312-658-5555 (Fax)

**September 28, 2016**

In re: *Lawrence E. Schwanke, DC, d/b/a Back to Basics Family Chiropractic v. Earlyshares.com, Inc., et al.* (MDFL).

**Demand for Preservation of All Tangible Documents
Including Electronically Stored Information**

As part of the Class Action Complaint against Earlyshares.com, Inc., et al., plaintiff, Lawrence E. Schwanke, DC, d/b/a Back to Basics Family Chiropractic ("Plaintiff"), hereby issues a demand for Defendants to preserve all tangible documents, including electronically stored information.

As used in this document, "you" and "your" refers to Defendants, and its predecessors, successors, parents, subsidiaries, divisions or affiliates, and their respective officers, directors, agents, attorneys, accountants, employees, partners or other persons occupying similar positions or performing similar functions.

You should anticipate that much of the information subject to disclosure or responsive to discovery in this matter is stored on your current and former computer systems and other media and devices (including personal digital assistants, voice-messaging systems, online repositories and cell phones).

Electronically stored information (hereinafter "ESI") should be afforded the broadest possible definition and includes (by way of example and not as an exclusive list) potentially relevant information electronically, magnetically or optically stored as:

• Digital communications (e.g., e-mail, voice mail, instant messaging);
• Word processed documents (e.g., Word or WordPerfect documents and drafts);
• Spreadsheets and tables (e.g., Excel or Lotus 123 worksheets);
• Accounting Application Data (e.g., QuickBooks, Money, Peachtree data files);
• Image and Facsimile Files (e.g., .PDF, .TIFF, .JPG, .GIF images);
• Sound Recordings (e.g., .WAV and .MP3 files);
• Video and Animation (e.g., .AVI and .MOV files);
• Databases (e.g., Access, Oracle, SQL Server data, SAP);

1

- Contact and Relationship Management Data (e.g., Outlook, ACT!);
- Calendar and Diary Application Data (e.g., Outlook PST, Yahoo, blog tools);
- Online Access Data (e.g., Temporary Internet Files, History, Cookies);
- Presentations (e.g., PowerPoint, Corel Presentations)
- Network Access and Server Activity Logs;
- Project Management Application Data;
- Computer Aided Design/Drawing Files; and,
- Back Up and Archival Files (e.g., Zip, .GHO)

ESI resides not only in areas of electronic, magnetic and optical storage media reasonably accessible to you, but also in areas you may deem not reasonably accessible. You are obliged to preserve potentially relevant evidence from both these sources of ESI, even if you do not anticipate producing such ESI.

The demand that you preserve both accessible and inaccessible ESI is reasonable and necessary. Pursuant to amendments to the Federal Rules of Civil Procedure that have been approved by the United States Supreme Court (eff. 12/1/05), you must identify all sources of ESI you decline to produce and demonstrate to the court why such sources are not reasonably accessible. For good cause shown, the court may then order production of the ESI, even if it finds that it is not reasonably accessible. Accordingly, even ESI that you deem reasonably inaccessible must be preserved in the interim so as not to deprive the plaintiffs of their right to secure the evidence or the Court of its right to adjudicate the issue.

### A.   Preservation Requires Immediate Intervention

You must act immediately to preserve potentially relevant ESI regarding the time period of January 2012 to the date You receive this letter. Potentially relevant ESI includes, but is not limited to information:

1. Regarding the events and causes of action described in Plaintiff's Class Action Complaint; and
2. Regarding Your claims or defenses to Plaintiff's Class Action Complaint.

Adequate preservation of ESI requires more than simply refraining from efforts to destroy or dispose of such evidence. You must also intervene to prevent loss due to routine operations and employ proper techniques and protocols suited to protection of ESI. Be advised that sources of ESI are altered and erased by continued use of your computers and other devices. Booting a drive, examining its contents or running any application will irretrievably alter the evidence it contains and may constitute unlawful spoliation of evidence. Consequently, alteration and erasure may result from your failure to act diligently and responsibly to prevent loss or corruption of ESI. Nothing in this demand for preservation of ESI should be understood to diminish your

concurrent obligation to preserve document, tangible things and other potentially relevant evidence.

### B.    Suspension of Routine Destruction

You are directed to immediately initiate a litigation hold for potentially relevant ESI, documents and tangible things, and to act diligently and in good faith to secure and audit compliance with such litigation hold. You are further directed to immediately identify and modify or suspend features of your information systems and devices that, in routine operation, operate to cause the loss of potentially relevant ESI. Examples of such features and operations include:

- Purging the contents of e-mail repositories by age, capacity or other criteria;
- Using data or media wiping, disposal, erasure or encryption utilities or devices;
- Overwriting, erasing, destroying or discarding back up media;
- Re-assigning, re-imaging or disposing of systems, servers, devices or media;
- Running antivirus or other programs effecting wholesale metadata alteration;
- Releasing or purging online storage repositories;
- Using metadata stripper utilities;
- Disabling server or IM logging; and,
- Executing drive or file defragmentation or compression programs.

### C.    Guard Against Deletion

You should anticipate that your employees, officers or others may seek to hide, destroy or alter ESI and act to prevent or guard against such actions. Especially where company machines have been used for Internet access or personal communications, you should anticipate that users may seek to delete or destroy information they regard as personal, confidential or embarrassing and, in so doing, may also delete or destroy potentially relevant ESI. This concern is not one unique to you or your employees and officers. It's simply an event that occurs with such regularity in electronic discovery efforts that any custodian of ESI and their counsel are obliged to anticipate and guard against its occurrence.

### D.    Preservation by Imaging

You should take affirmative steps to prevent anyone with access to your data, systems and archives from seeking to modify, destroy or hide electronic evidence on network or local hard drives (such as by deleting or overwriting files, using data shredding and overwriting applications, defragmentation, re-imaging or replacing drives, encryption, compression, steganography or the like). With respect to local hard drives, one way to protect existing data on local hard drives is by the creation and authentication of a forensically qualified

3

image of all sectors of the drive. Such a forensically qualified duplicate may also be called a bitstream image or clone of the drive. Be advised that a conventional back up of a hard drive is not a forensically qualified image because it only captures active, unlocked data files and fails to preserve forensically significant data that may exist in such areas as unallocated space, slack space and the swap file.

With respect to the hard drives and storage devices of each of the persons named below and of each person acting in the capacity or holding the job title named below, as well as each other person likely to have information pertaining to the instant action on their computer hard drive(s), demand is made that you immediately obtain, authenticate and preserve forensically qualified images of the hard drives in any computer system (including portable and home computers) used by that person during the period from August 2012 to today's date as well as recording and preserving the system time and date of each such computer.

Once obtained, each such forensically qualified image should be labeled to identify the date of acquisition, the person or entity acquiring the image and the system and medium from which it was obtained. Each such image should be preserved without alteration.

### E.   Preservation in Native Form

You should anticipate that certain ESI, including but not limited to spreadsheets and databases, will be sought in the form or forms in which it is ordinarily maintained. Accordingly, you should preserve ESI in such native forms, and you should not select methods to preserve ESI that remove or degrade the ability to search your ESI by electronic means or make it difficult or burdensome to access or use the information efficiently in the litigation. You should additionally refrain from actions that shift ESI from reasonably accessible media and forms to less accessible media and forms if the effect of such actions is to make such ESI not reasonably accessible.

### F.   Metadata

You should further anticipate the need to disclose and produce system and application metadata and act to preserve it. System metadata is information describing the history and characteristics of other ESI. This information is typically associated with tracking or managing an electronic file and often includes data reflecting a file's name, size, custodian, location and dates of creation and last modification or access. Application metadata is information automatically included or embedded in electronic files but which may not be apparent to a user, including deleted content, draft language, commentary, collaboration and distribution data and dates of creation and printing. Be advised that metadata may be overwritten or corrupted by careless

4

handling or improper steps to preserve ESI. For electronic mail, metadata includes all header routing data and Base 64 encoded attachment data, in addition to the To, From, Subject, Received Date, CC and BCC fields.

### G.    Servers

With respect to servers like those used to manage electronic mail (e.g., Microsoft Exchange, Lotus Domino) or network storage (often called a user's "network share"), the complete contents of each user's network share and e-mail account should be preserved. There are several ways to preserve the contents of a server depending upon, e.g., its RAID configuration and whether it can be downed or must be online 24/7. If you question whether the preservation method you pursue is one that we will accept as sufficient, please call to discuss it.

### H.    Home Systems, Laptops, Online Accounts and Other ESI Venues

Though we expect that you will act swiftly to preserve data on office workstations and servers, you should also determine if any home or portable systems may contain potentially relevant data. To the extent that officers, board members or employees have sent or received potentially relevant e-mails or created or reviewed potentially relevant documents away from the office, you must preserve the contents of systems, devices and media used for these purposes (including not only potentially relevant data from portable and home computers, but also from portable thumb drives, CD-R disks and the user's PDA, smart phone, voice mailbox or other forms of ESI storage.). Similarly, if employees, officers or board members used online or browser-based email accounts or services (such as AOL, Gmail, Yahoo Mail or the like) to send or receive potentially relevant messages and attachments, the contents of these account mailboxes (including Sent, Deleted and Archived Message folders) should be preserved.

### I.    Ancillary Preservation

You must preserve documents and other tangible items that may be required to access, interpret or search potentially relevant ESI, including logs, control sheets, specifications, indices, naming protocols, file lists, network diagrams, flow charts, instruction sheets, data entry forms, abbreviation keys, user ID and password rosters or the like.

You must preserve any passwords, keys or other authenticators required to access encrypted files or run applications, along with the installation disks, user manuals and license keys for applications required to access the ESI. You must preserve any cabling, drivers and hardware, other than a standard 3.5" floppy disk drive or standard CD or DVD optical disk drive, if needed to access

or interpret media on which ESI is stored. This includes tape drives, bar code readers, Zip drives and other legacy or proprietary devices.

### J.    Paper Preservation of ESI is Inadequate

As hard copies do not preserve electronic searchability or metadata, they are not an adequate substitute for, or cumulative of, electronically stored versions. If information exists in both electronic and paper forms, you should preserve both forms.

### K.    Agents, Attorneys and Third Parties

Your preservation obligation extends beyond ESI in your care, possession or custody and includes ESI in the custody of others that is subject to your direction or control. Accordingly, you must notify any current or former agent, attorney, employee, custodian or contractor in possession of potentially relevant ESI to preserve such ESI to the full extent of your obligation to do so, and you must take reasonable steps to secure their compliance.

### L.    System Sequestration or Forensically Sound Imaging

We suggest that, with respect to Defendants removing their ESI systems, media and devices from service and properly sequestering and protecting them may be an appropriate and cost-effective preservation step. In the event you deem it impractical to sequester systems, media and devices, we believe that the breadth of preservation required, coupled with the modest number of systems implicated, dictates that forensically sound imaging of the systems, media and devices is expedient and cost effective. As we anticipate the need for forensic examination of one or more of the systems and the presence of relevant evidence in forensically accessible areas of the drives, we demand that you employ forensically sound ESI preservation methods. Failure to use such methods poses a significant threat of spoliation and data loss.

By "forensically sound," we mean duplication, for purposes of preservation, of all data stored on the evidence media while employing a proper chain of custody and using tools and methods that make no changes to the evidence and support authentication of the duplicate as a true and complete bit-for-bit image of the original. A forensically sound preservation method guards against changes to metadata evidence and preserves all parts of the electronic evidence, including the so-called "unallocated clusters," holding deleted files.

### M.    Preservation Protocols

We are desirous of working with you to agree upon an acceptable protocol for forensically sound preservation and can supply a suitable protocol,

6

if you will furnish an inventory of the systems and media to be preserved. Else, if you will promptly disclose the preservation protocol you intend to employ, perhaps we can identify any points of disagreement and resolve them. A successful and compliant ESI preservation effort requires expertise. If you do not currently have such expertise at your disposal, we urge you to engage the services of an expert in electronic evidence and computer forensics. Perhaps our respective expert(s) can work cooperatively to secure a balance between evidence preservation and burden that's fair to both sides and acceptable to the Court.

### N.    Do Not Delay Preservation

I'm available to discuss reasonable preservation steps; however, you should not defer preservation steps pending such discussions if ESI may be lost or corrupted as a consequence of delay. Should your failure to preserve potentially relevant evidence result in the corruption, loss or delay in production of evidence to which we are entitled, such failure would constitute spoliation of evidence, and we will not hesitate to seek sanctions.

### O.    Confirmation of Compliance

Please confirm that you have taken the steps outlined in this letter to preserve ESI and tangible documents potentially relevant to this action. If you have not undertaken the steps outlined above, or have taken other actions, please describe what you have done to preserve potentially relevant evidence.


Respectfully,



Phillip A. Bock
Bock, Hatch, Lewis & Oppenheim, LLC
134 N. LaSalle St., Suite 1000
Chicago, IL 60602
312-658-5500
phil@classlawyers.com